# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 19-718


**STATE OF LOUISIANA**

**VERSUS**

**TOBIAS LAMONT WILLIAMS**


**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 90658-B
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of John D. Saunders, Billy Howard Ezell, and Candyce G. Perret, Judges.


**AFFIRMED; REMANDED WITH INSTRUCTIONS**

**Asa Allen Skinner**
**District Attorney, 30th Judicial District Court**
**P. O. Box 1188**
**Leesville, LA 71496-1188**
**(337) 239-2008**
**COUNSEL FOR:**
**State of Louisiana**

**Terry Wayne Lambright**
**118 South Third Street, Suite A**
**Leesville, LA 71446**
**(337) 239-6557**
**COUNSEL FOR:**
**State of Louisiana**

**Meghan Harwell Bitoun**
**639 North Alexander Street**
**New Orleans, LA 70119**
**(504) 470-4779**
**COUNSEL FOR DEFENDANT:**
**Tobias Lamont Williams**

**Tobias Lamont Williams**
**Louisiana State Prison**
**Mian Prison Walnut-3**
**Angola, La 70712**

**EZELL, Judge.**

On February 2, 2017, a Vernon Parish Grand Jury indicted Defendant, Tobias Lamont Williams, for one count of being a principal to the second degree murder of Jonathan Lance Ellis, in violation of La.R.S. 14:24 and 14:30.1, as well as one count of obstruction of justice, in violation of La.R.S. 14:130.1. Trial by jury began on March 18, 2019, and on March 21, 2019, the jury unanimously found Defendant guilty as charged on both counts.

On April 16, 2019, Defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence for the murder conviction, as well as forty years at hard labor for the obstruction of justice conviction.

Defendant now appeals his conviction and sentence for second degree murder, contending "[t]here was insufficient evidence to convict [Defendant] of second degree murder." For the following reasons, we affirm Defendant's second degree murder conviction and sentence for same.

## FACTS

Testimony presented to the jury revealed the following facts. The State's first witness was Mrs. Sarah Ellis, the wife of the victim, Jonathan Ellis. She testified that at the time Mr. Ellis was murdered, he was living in Vernon Parish in a travel trailer while transitioning out of the military and she was living and working in New Iberia. Mrs. Ellis testified her husband would stay at their home in New Iberia and travel back to Vernon Parish when he had meetings for the military. She stated she last spoke to him on September 19, 2016, when he called to let her know he had arrived safely and had spoken to their kids. Mrs. Ellis stated she was awaiting a call regarding her husband's meeting the following day, a call she never received.

Mrs. Ellis testified that after two days of no one being able to contact her husband, she finally contacted his commander. She testified military police tried to locate his phone but were unable to and she was eventually put in contact with the Vernon Parish Sheriff's Office. About two weeks later, Mr. Ellis's phone was reactivated in Lafayette, and Mrs. Ellis attempted to help law enforcement find the phone using a locator app on her phone. Eventually, they recovered Mr. Ellis's phone from a man named Shawn Bowman. Mrs. Ellis testified her husband's bank card was used to make a purchase at a Shop Rite directly across from where he kept his travel trailer before a failed attempt to withdraw money from an ATM.

Mrs. Ellis testified that she initially told law enforcement the only thing missing from Mr. Ellis's trailer was his gun, but that she subsequently found the weapon and informed law enforcement. She testified numerous items were missing from Mr. Ellis's 1996 green Ford F250 truck when it was recovered, including a red toolbox and a CB radio. Mrs. Ellis stated law enforcement found Mr. Ellis's remains in November but could not identify them until May of 2017; during that time, the military considered him AWOL.

The State's next witness was Special Agent Joaquin Thomas with the United States Army, Criminal Investigation Command (CID). Special Agent Thomas noted that he worked jointly with the Vernon Parish Sheriff's Office, particularly Detective David Vance. Special Agent Thomas stated CID began investigating around September 23, 2016, initially considering the case a missing persons case. He noted the initial investigation connected Mrs. Wanda Gordon to the case as a person of interest because her number was one of the last to contact the victim's phone. He noted that Mrs. Ellis helped the Lafayette Police Department locate the victim's phone, which was in the possession of Mr. Bowman. Mr. Bowman informed law

enforcement that he purchased the phone from Mrs. Gordon. Special Agent Thomas testified that while canvassing in Leesville, law enforcement spoke to a Mr. Brian Cheley, who introduced them to the name Tobias Campbell, which was subsequently identified as a nickname for Defendant, who has a brother with the last name Campbell.

Special Agent Thomas testified that his involvement in the case lasted from September of 2016 into June of 2017; he stated there were no serious suspects uncovered other than Wanda Gordon and Defendant. On September 29, 2016, Mrs. Gordon and an associate named Ashley Cenate were arrested in Tyler, Texas, in relation to a stolen truck they were driving, which was unrelated to the instant case. The same day, Special Agent Thomas spoke to Defendant via telephone for the first time. Initially, Defendant stated he never called Mr. Ellis's number, then immediately stated he called the number after he had multiple missed calls from said number. Special Agent Thomas testified Defendant's initial story indicated Mrs. Gordon was walking when Defendant saw her and Defendant did not have a vehicle.

Special Agent Thomas testified Vernon Parish law enforcement located Mr. Ellis's truck at a trailer park in Leesville and had the vehicle towed. According to Special Agent Thomas, Defendant spoke with Special Agent Brian Beetle on October 3, 2016, and Defendant stated he met with Mrs. Gordon on September 20, 2016, in Leesville, where Mrs. Gordon tried to sell him sex and a phone. Defendant apparently stated he turned down the sex but wanted the phone; however, he did not purchase it because Mrs. Gordon insisted on trading drugs for the phone. Special Agent Thomas testified Mrs. Gordon was arrested in Tyler, Texas, on October 18, 2016, and he had the opportunity to interview her in Tyler. According to Special Agent Thomas, Mrs. Gordon denied having any involvement in Mr. Ellis's

disappearance, but admitted to selling his phone to Mr. Bowman, claiming she got the phone from a man named "Leggs," who came to her in Mr. Ellis's truck. She stated she had known Mr. Ellis for about three months and had had sex with him previously. Mrs. Gordon initially stated she never drove Mr. Ellis's truck.

Special Agent Thomas testified Ms. Cenate was also arrested in Tyler, Texas, and extradited back to Leesville and noted one of the first things she said upon her arrest was that Mrs. Gordon was involved in some kind of homicide. Special Agent Thomas stated Ms. Cenate was fitted with recording equipment and subsequently had a conversation with Mrs. Gordon about the killing. Special Agent Thomas testified another interview of Defendant occurred on October 24, 2016, and that Defendant's story now included him being in the victim's truck with Mrs. Gordon and a Mr. Denny Peters. According to Special Agent Thomas, Defendant stated Mrs. Gordon was driving the truck and told him the truck belonged to one of her "tricks," or prostitution clients. Defendant again stated Mrs. Gordon tried to sell him a phone, which he did not buy. At that time, Defendant denied having ever met the victim and stated he had called the victim's phone because that was the number Mrs. Gordon gave him.

On October 27, 2016, a multi-stage interview of Defendant was conducted. Special Agent Thomas observed the initial portion of the interview and noted Defendant was falling asleep in his chair while being questioned. Defendant stated he had never met Mrs. Gordon prior to September 19, 2016, admitted he got into Mr. Ellis's truck, which Mrs. Gordon told him belonged to one of her tricks, and went with her to the Shop Rite in Leesville. Defendant then claimed he and Mrs. Gordon went to the Old Forks Projects where Mrs. Gordon tried to obtain drugs. Special

4

Agent Thomas noted Defendant's story no longer involved Mr. Peters being in the vehicle with them.

During the second phase of the interview, Defendant introduced his cousin's mother into the story, as she allegedly told Defendant she had seen Mr. Ellis and Mrs. Gordon together in Leesville. In Defendant's next story, he claimed he saw Mr. Ellis's truck driving past him and stated Mrs. Gordon asked him if he knew how to withdraw money from a bank card, which he described as green with "Jonathan Ellis" on it, without the PIN number. She asked him if he wanted to purchase a phone. Defendant stated he attempted to withdraw money from the bank card and mentioned that Mrs. Gordon smelled like gas. He also alleged Mrs. Gordon disposed of a wallet while driving. Defendant then stated they picked up Denny Peters at an area known for prostitution and drugs. Defendant stated Mrs. Gordon told him two other individuals, named Anthony Burns and Money Mike, were responsible for Mr. Ellis's disappearance.

On October 28, 2016, Defendant was again interviewed. Special Agent Thomas participated in the interview and noted Defendant told them Mrs. Gordon had approached him with Mr. Ellis in the vehicle. Defendant then stated Mrs. Gordon killed Mr. Ellis in the woods near Industrial Road, claiming she shot him four times. Defendant claimed Mr. Ellis and Mrs. Gordon were "doing business" on a pile of trash while he sat in Mr. Ellis's truck. Law enforcement searched the area and found no evidence to corroborate Defendant's story. Defendant then gave another interview, this time stating some unidentified "they" had moved the body. Defendant did, however, state he knew the body had been burned.

Defendant was interviewed, again on October 28, 2016. This time, Defendant's story was that Mr. Ellis was driving the truck and that he was offered a

5

ride after discussing drug purchases with Mrs. Gordon. Defendant claimed Mr. Ellis wanted sex, but Mrs. Gordon refused because he had not paid her for his last encounter with her. According to Defendant, Mr. Ellis drove out into a secluded area where he and Mrs. Gordon got out of the truck. Defendant stated he could not see Mrs. Gordon but that he heard four gunshots before Mrs. Gordon returned to the truck and the two of them left Mr. Ellis in the woods. Defendant described both Mrs. Gordon and the truck as smelling strongly of gasoline and stated Mr. Ellis's wallet was tossed out of the vehicle. Mrs. Gordon allegedly gave Defendant a pill bottle containing Percocet. Special Agent Thomas confirmed Mr. Ellis had been prescribed Percocet. Defendant stated he removed the label from the pill bottle and stated the bottle had been burned on a burn pile at Defendant's home.

On November 14, 2016, Defendant was again interviewed by Special Agent Thomas and Detective Vance. Special Agent Thomas summarized Defendant's new version of the story:

> Initially Mr. Williams denied he moved Captain Ellis' body, but then he knew where it was, but then he later changed that and said he moved the body with the help of others. He reconfirmed in his words that Mrs. Gordon shot Captain Ellis four times. Mr. Williams stated he saw the body at Industrial Road and he said Mrs. Gordon wrapped the body now in a sheet that was found out there and put Mr. Ellis in the rear bed of his truck. Mr. Williams described the effects of the wounds as he perceived saying there was a bullet wound to the right side of his face and two bullet wounds in his chest. Mr. Williams stated he and Mrs. Gordon drove to Cassetti Brown's house and now he introduced a new person by the name of Amy and said that they picked Amy up. At this point Mrs. Gordon, Amy and Williams drove to the area of Captain Ellis' - - where his vehicle was found and met with a David.

Defendant told law enforcement this individual, David, threatened him with a shotgun and purchased gasoline to burn Mr. Ellis's body. Defendant claimed they took the victim's body to a burn site and burned the body in a pile of tires and subsequently wood, with Defendant claiming he helped out of fear. Law

6

enforcement located a burn pile in the area Defendant indicated but found no evidence a human body had been burned there.

On November 15, 2016, Defendant again spoke with law enforcement and indicated Mr. Ellis's body did not burn properly, so it was moved to Defendant's property. Law enforcement then proceeded to 376 Dean Conerly Road, Defendant's residence. Again, law enforcement found a burn pile; however, this time they found human remains. Special Agent Thomas noted they also searched a pond on an adjacent piece of property. Additionally, he noted they contacted the FACES (Forensic Anthropology and Computer Enhancement Services) lab at Louisiana State University. While discussing numerous photographs of Defendant's residence, Special Agent Thomas noted remains were found in the burn pile, in a dry creek bed, and along the tree line separating Defendant's property from his neighbor's land. He also noted remains were located in the pond on Defendant's neighbor's property. Following recovery of the human remains, Defendant was taken into custody.

On November 17, 2016, Defendant gave another statement to Special Agent Thomas and Detective Vance. Noting that he recorded the conversation, Special Agent Thomas could not recall the specifics of Defendant's statement that day. Special Agent Thomas testified he and Detective Vance interviewed Defendant's live-in girlfriend, Ms. Dominishca Smith, on November 22, 2016. He noted Ms. Smith was interviewed multiple times and gave differing stories during those interviews. Eventually, information from Ms. Smith led to both Defendant and Mrs. Gordon being charged with murder and obstruction of justice.

The State then called Mrs. Wanda Gordon. Mrs. Gordon noted she is serving a forty-year sentence pursuant to pleading guilty to the manslaughter of Mr. Jonathan Ellis. Mrs. Gordon testified that she was not receiving any benefit for testifying and

acknowledged that she has told "a lot of lies" to law enforcement in order to try and avoid criminal liability. She testified that she believed Mr. Ellis had four or five hundred dollars in his possession and that she brought him to Defendant's home in the hope that Defendant could help her rob Mr. Ellis. Mrs. Gordon acknowledged having a bad crack cocaine addiction and noted she drank vodka and smoked Kool 100s cigarettes. She stated she had supported her addiction through prostitution for eighteen years, "on and off." She testified she used the dating site Plenty of Fish to meet prostitution clients and testified she met Mr. Ellis on the website and saw him three or four times, starting in June of 2016. She also acknowledged that she frequently robbed her prostitution clients.

Mrs. Gordon testified that she texted Defendant and told him she had someone with money who would be easy to rob and Defendant told her to bring him to Defendant's house. She stated she and Mr. Ellis went to Defendant's home in Mr. Ellis's truck. Mrs. Gordon testified she believed Mr. Ellis had four hundred dollars because he had told her that was how much he had, at which point she texted Defendant from a phone Mrs. Gordon had stolen from her friend, Emmett Cheley. Mrs. Gordon also stated she was interested in pills that Mr. Ellis had because of their street value, although she claimed she found out about the pills "after everything had happened." She testified she and Mr. Ellis made a stop and he bought vodka and Kool cigarettes before heading to Defendant's home.

Mrs. Gordon testified that she told Mr. Ellis to give her the four hundred dollars he had previously told her he had, and he refused. At that point, she told Defendant, who handed her a gun and told her to just kill Mr. Ellis. After again telling Mr. Ellis to give her the money, Mrs. Gordon shot him in the back of the head as he was walking away from her. Mrs. Gordon testified that after she shot Mr. Ellis,

she and Defendant robbed him, ultimately obtaining Mr. Ellis's cell phone, eighty dollars cash, and a bottle of Percocet. According to Mrs. Gordon, she took the phone and Defendant took the cash and the pills. They then drug Mr. Ellis's body to Defendant's burn pile, doused him in gasoline, and lit his body on fire. Mrs. Gordon stated she was unaware of anyone else being at Defendant's home but that she did not go inside the home. Eventually, she and Defendant left in Mr. Ellis's truck and drove around, noting they picked someone up in the Old Forks Project on Nona Street then went to the home of Mrs. Gordon's ex-boyfriend, Clarence Justice. She testified Denny Peters was the individual she and Defendant picked up prior to heading to Mr. Justice's house. She stated they were all getting high when Defendant started "acting fidgety and funny" so she and Defendant left Mr. Justice's house to ride around, ultimately ending up in a wooded area where Mrs. Gordon performed oral sex on Defendant. Mrs. Gordon testified she got high on crack cocaine while the three men smoked methamphetamine.

According to Mrs. Gordon, after she killed Mr. Ellis, they stole eighty dollars out of his pocket, as she claimed he was not carrying a wallet and did not have any debit cards on him. Although Mrs. Gordon stated she and Defendant did not speak once they returned to Defendant's home, she claimed she stayed in the truck drinking through the night until the sun had come up. She testified Defendant then brought her to Eddie Shaw's house and she did not hear from him again until she was arrested.

Mrs. Gordon testified that while she was going back and forth between Mr. Shaw's house and "the slab" where she often picks up clients and buys drugs, she ran into her ex-girlfriend, Ashley Cenate, also a prostitute. Ms. Cenate obtained a truck from a Mr. Cory Evans by trading drugs for use of said truck. Ms. Cenate and

Mrs. Gordon then travelled to Alexandria, where Mrs. Gordon stole money from her husband's wallet, before travelling to Shreveport and ultimately Tyler, Texas. Mrs. Gordon testified they spent two hours at a casino in Shreveport before heading to Tyler. Mrs. Gordon stated Ms. Cenate got rid of the truck and they remained in Tyler until they were arrested. She acknowledged telling multiple false stories prior to pleading guilty but stated her testimony was the whole truth; namely that Defendant gave her the gun to kill Mr. Ellis and was involved in robbing Mr. Ellis after the shooting.

On cross-examination, Mrs. Gordon stated she did not initially identify Defendant in a photographic lineup because she did not want to at that point. She stated she was high when she killed Mr. Ellis and that affected her judgment. Mrs. Gordon testified she took Mr. Ellis's phone from his pocket.

The State's next witness was Mr. Denny Peters. Mr. Peters testified he saw Defendant and Mrs. Gordon in a blue or green Ford truck on September 19, 2016, which he believed Defendant was driving. He testified he was hanging out at "the slab," when Defendant and Mrs. Gordon picked him up and they drove to Clarence Justice's house, where they did drugs until Mr. Justice's wife got into an altercation with Mrs. Gordon. At that point, Defendant and Mrs. Gordon left Mr. Justice's home. On cross-examination, Mr. Peters clarified he was not sure who was driving the truck but that only Defendant and Mrs. Gordon were in the vehicle. He stated he did not see anyone sell drugs to Mrs. Gordon while he was with her.

The State then presented the testimony of Ms. Dominishca Smith. Ms. Smith stated Defendant is her fiancé and acknowledged they have children together. She testified she saw Mrs. Gordon shoot Mr. Ellis in the back of the head. Ms. Smith stated Defendant helped Mrs. Gordon but it was not voluntary because Mrs. Gordon

hit him in the back of the head with a gun prior to him helping her. Ms. Smith testified that only Mrs. Gordon took anything from Mr. Ellis, claiming she took two phones and a wallet from him before they disposed of the body. She acknowledged Defendant and Mrs. Gordon placed Mr. Ellis's body on the burn pile and burned it but claimed she could not remember how long it burned. Ms. Smith testified that Mrs. Gordon "told [Defendant] if he didn't help her dispose of the body she was going to kill him and his children and [Ms. Smith] and burn the house down."

While the State tried to walk Ms. Smith through the various versions of events she has previously given, she stated she did not remember changing her story after the first time she was interviewed but claimed she was emotional during the second conversation because law enforcement mentioned her deceased grandparents while trying to get her to tell the truth. She claimed she did not remember what she said to Detective Vance at that time. Ms. Smith acknowledged testifying at the grand jury hearing, but stated she gave different testimony because she felt threatened by the district attorney and law enforcement. She continued to avoid answering questions about why her story had changed multiple times by claiming she was threatened by Detective Vance because she overheard his conversation with Mrs. Ellis prior to her testimony. When the prosecutor explained what perjury is, noted it is a felony, and reminded Ms. Smith that her "arrest based on [her] behavior in this case is a possibility, but it's not a threat," Ms. Smith stated she felt threatened with perjury as well.

Ms. Smith acknowledged that during her first interview with law enforcement, she did not give the same story that she gave at trial. She also acknowledged her story of what happened when Mr. Ellis died was different during her second interview, her grand jury testimony, and during the motion to perpetuate her

11

testimony held in March of 2017. Ms. Smith acknowledged she had never told law enforcement the version of events she testified to at trial. After reviewing Ms. Smith's first version of events, she stated she did not tell her current version of events because that was not what Detective Vance wanted to hear, despite admitting Detective Vance had not told her what to say. She then stated law enforcement did not intimidate her the day of her first interview. Regarding her initial story, she stated it was true that Defendant had called her about buying Percocet for her to resell, stating she did not take them herself.

Ms. Smith then stated Mr. Ellis's body had stopped burning within three hours. Although she could not remember what time Mrs. Gordon left, she testified she got into a car and left. She then testified Denny Peters ended up with Mr. Ellis's truck, not Defendant, although she had no idea how the truck left her yard. Ms. Smith then changed her story and stated Mrs. Gordon took the truck. Ms. Smith testified she had no idea who Mr. Ellis or Mrs. Gordon were until getting involved with the case, as she initially identified them simply as a Caucasian male and a Caucasian female. Acknowledging she discussed the night's events with Defendant, Ms. Smith stated Defendant told her what happened, then argued with the State about whether Defendant told her what happened or if she saw it happen.

Ms. Smith testified Mrs. Gordon got the gun she used to kill Mr. Ellis out of his truck, claiming neither Mrs. Gordon nor Defendant had a gun. She assumed Mrs. Gordon hid the gun before having an argument with Mr. Ellis about wanting drugs before they had sex. At that point, Mr. Ellis told her no and turned to walk away, and Mrs. Gordon shot him in the back of the head. Ms. Smith again testified that she has never lied, despite telling a different story each time she has been interviewed or testified.

The State played a video of Ms. Smith's second interview with law enforcement, during which she claimed Mr. Ellis was killed somewhere other than her home. Again, she stated she did not lie to law enforcement. Ms. Smith maintained that she was threatened and/or emotionally exploited and claimed that part was not included in the video. She finally agreed she lied when she said the murder happened at a different location. In her third interview, Ms. Smith again stated law enforcement did not tell her what to say but that she did not make up the details. Despite her not mentioning Defendant being coerced, stating he went through Mr. Ellis's pockets, and stating Defendant periodically added fuel to the fire over multiple days, she insisted she gave the true details of what happened during her third interview. She acknowledged the version she told during that third interview was the same story she testified to at the grand jury proceedings. Additionally, she noted that story made up a large part of what she testified to at the March 17, 2017, hearing on the motion to perpetuate her testimony.

Ms. Smith acknowledged that she involved Denny Peters during her testimony at the motion to perpetuate her testimony, despite not including him in her initial testimony at trial. The State then introduced the recordings of Ms. Smith's prior interviews with law enforcement, as well as transcripts of her testimony at the grand jury hearing and the hearing on the motion to perpetuate her testimony.

On cross-examination, Ms. Smith testified that she knew Mr. Ellis from the Plenty of Fish website and that he was coming to bring her money and nothing else. She stated she had never told law enforcement that fact. She maintained she had no idea who Mrs. Gordon was. Ms. Smith stated she was sitting in the living room watching TV with Mr. Ellis, getting to know him, when Mrs. Gordon came into the house and began arguing with Mr. Ellis. She then stated she heard the gunshot and

13

never saw Mrs. Gordon shoot Mr. Ellis, despite repeatedly telling the State that she had seen Mrs. Gordon kill Mr. Ellis. She claimed Mrs. Gordon arrived in a separate vehicle after Mr. Ellis had already arrived, a vehicle which left, and that Mrs. Gordon left in Mr. Ellis's truck. Despite saying she did not see the shooting, she still testified Mrs. Gordon got the gun she used to kill Mr. Ellis from his truck.

Ms. Smith adamantly refuted the suggestion she was a prostitute, claiming she was on Plenty of Fish to meet friends, that Mr. Ellis was just a charitable person bringing her money to buy some things for her children, that he was the first person who had ever come to her house from Plenty of Fish, and that she was not getting paid for sex. Ms. Smith testified Defendant told Mrs. Gordon he was going to call the police, at which point Mrs. Gordon started cussing at Defendant and threatened to kill both Defendant and Ms. Smith if Defendant did not help her get rid of the body. She testified that once Defendant helped Mrs. Gordon place Mr. Ellis's body on the burn pile, Mrs. Gordon took the gun back out and made Defendant get fuel for the fire at gunpoint.

When asked why Defendant continued to burn the body for two days after Mrs. Gordon left the morning after Mr. Ellis died, Ms. Smith testified that a man in a black vehicle that knew Mrs. Gordon was hanging around to make sure the body continued to burn. She testified the man would stand outside of his black car with a gun in the yard, making sure the body was burned. Ms. Smith subsequently stated the man, whom she described as a black male with short dreadlocks, would leave and come back every two or three hours, that he did not stay. She testified that Denny Peters was not involved in the killing.

The following testimony from Ms. Smith was related by her at the hearing to perpetuate her testimony held on March 17, 2017. This version of Ms. Smith's story

14

involved Mr. Ellis and Mrs. Gordon coming to 376 Dean Conerly in Mr. Ellis's truck and Defendant going outside to meet them. She ultimately stated that after Mrs. Gordon shot Mr. Ellis, both she and Defendant went through Mr. Ellis's pockets before putting him on the burn pile. She testified that Mrs. Gordon got rid of Mr. Ellis's truck and that Defendant had nothing to do with disposing of the truck. She testified Defendant put parts of Mr. Ellis's body into a garbage bag and took it to the pond behind their home. She also testified she saw Defendant throw parts of the body into the woods line behind the house. Ms. Smith acknowledged it took multiple days for Mr. Ellis's body to be burnt and stated Defendant obtained a number Percocet pills from Mr. Ellis.

Ms. Smith ultimately changed her story and stated Defendant was riding with Mr. Ellis and Mrs. Gordon when they arrived at her home. She eventually stated the reason they were there was so Mrs. Gordon and Defendant could rob Mr. Ellis, noting they split eighty dollars that was taken out of his wallet before it was burned. She stated she could not hear any conversation between Defendant and Mrs. Gordon after the shooting. She claimed Mrs. Gordon never came inside her home. She then changed her story again and claimed Mrs. Gordon, Mr. Ellis, and Denny Peters came to her house in Mr. Ellis's truck. She also repeatedly claimed she had been coerced into giving stories by the prosecutor, Detective Vance, and Special Agent Thomas. She stated Denny Peters forced Defendant to help with burning the body.

Ms. Smith testified that Mr. Peters hit Defendant in the back of the head with a gun for asking why Mrs. Gordon was not helping move the body. According to Ms. Smith, both Mrs. Gordon and Mr. Peters had guns. In this version, she attributes to Mr. Peters the threat that Defendant, Ms. Smith, and their children are going to be murdered and the house burned down. She claimed Mr. Peters made Defendant

15

leave with Mrs. Gordon, in Mr. Ellis's truck, to get more gas for the fire. The State and Ms. Smith repeatedly went through a circular argument wherein Ms. Smith admitted some of what she said in her interviews with Detective Vance was untrue, claimed it was not a lie, said she was coerced into saying it, then admitted that no one told her what to say while still claiming she did not make details up.

Ms. Smith then stated Mr. Peters, his nephew, and his brother told her they would kill her and her whole family if Mr. Peters was charged and Defendant was not. She stated those threats stopped after the grand jury charged Defendant and not Mr. Peters. The State then played a jail recording wherein Ms. Smith refused to speak to Defendant about the case until he verified he was using someone else's phone card, she told him she already told law enforcement that he helped voluntarily before he told her she needed to say it was forced and that Denny Peters, a/k/a Tall for Nothing, was involved. She concluded by acknowledging that both Defendant and Mrs. Gordon went through Mr. Ellis's pockets, that Defendant took his wallet and split the money with Mrs. Gordon, they burned the body together, and Denny Peters had nothing to do with any of it.

The State then called Mr. Larry Smith, who worked at Chapel Rounds, a mobile home park. Mr. Smith testified he spoke to Detective Vance in November of 2016 about a dark F250 that had been abandoned near the park for about a week.

The State then called Dr. Ginesse Listi of the LSU FACES lab, who was accepted as an expert in the field of forensic anthropology. Dr. Listi stated the first thing she did upon arriving in Vernon Parish was meet with law enforcement at the Sheriff's Office to verify some of the remains recovered were human before she and her team went out to help law enforcement continue the search for human remains.

16

Dr. Listi noted there were three separate areas from which remains had been found near Defendant's home: the large burn pile, a drainage ditch, and "a third area some distance from the drainage ditch." Noting there was also a large wooded area nearby, Dr. Listi and her team split up to help law enforcement search the different areas. Dr. Listi noted definite human remains were recovered from the burn pile, the drainage ditch, and the wooded area. Dr. Listi testified she believed the bones located in the wooded area and the drainage ditch had been burned on the burn pile then moved, as there was no evidence any fire had occurred in the woods or drainage ditch.

The State then called Ms. Tayla Pinell, a forensic scientist specializing in DNA analysis for the Louisiana State Police Crime Lab. Ms. Pinell was accepted as an expert in DNA analysis. Ms. Pinell testified they were unable to match DNA from the recovered remains to anyone in the CODIS system but were able to identify the remains as that of Mr. Ellis based on DNA information subsequently obtained from the United States Army.

The State's next witness was Detective David Vance, a thirteen-year veteran and investigator for the Vernon Parish Sheriff's Office. Detective Vance testified he was initially contacted by Army CID on September 23, 2016, regarding an individual who had been missing since September 19, 2016. He stated he spoke with Mrs. Ellis early and on multiple occasions, eventually contacting the Lafayette Police Department when Mr. Ellis's phone was recovered in the possession of Mr. Shawn Bowman. Detective Vance testified Mrs. Gordon became a suspect because her estranged husband told Mrs. Ellis that Mrs. Gordon had contacted him and told him Mr. Ellis's number was her new number. Detective Vance acknowledged Mrs. Gordon gave multiple statements to him and noted Ms. Cenate was initially a

17

possible person of interest. He testified Ms. Cenate wore a wire to record a conversation with Mrs. Gordon during which Mrs. Gordon acknowledged shooting Mr. Ellis and after seeing Defendant, noted he was in just as much trouble as she was.

Detective Vance testified that he interviewed Ms. Dominishca Smith twice, noting her first interview was largely the same story Defendant had initially given and which in no way incriminated Defendant. Detective Vance stated Ms. Smith's story changed dramatically in her second interview. During her second interview, Detective Vance testified Ms. Smith, while sobbing uncontrollably, told him she had witnessed the entire incident. When she asked Defendant why Mr. Ellis and Mrs. Gordon were there, he told her they were about to rob Mr. Ellis because Defendant needed money. Ms. Smith saw Defendant, Mrs. Gordon, and Mr. Ellis talking, when Defendant walked away. She told Detective Vance Mr. Ellis went to walk away and Mrs. Gordon shot him in the back of the head. Ms. Smith subsequently saw Defendant and Mrs. Gordon taking things from Mr. Ellis's body before moving him to the burn pile and burning him for roughly two days. According to Detective Vance, Ms. Smith stated Defendant and Mrs. Gordon went to Walmart to obtain bleach and hand wipes. She also said Mr. Williams continued to try and burn the body.

Detective Vance then clarified that Ms. Smith actually returned a few days later, at his request, when she was less emotional and at that time she more or less confirmed her story from the second interview. He discussed the evolving nature of Ms. Smith's testimony and how she began to change her story when she felt bad about telling on Defendant, noting they were in communication while Defendant was incarcerated.

Detective Vance testified the first time he encountered Defendant during the investigation was October 24, 2016. He stated Defendant told him he did not know Mrs. Gordon, but that he passed her on the street one day and she asked Defendant if he wanted to buy a cell phone, which Defendant did not do. Detective Vance stated he told Defendant Mrs. Gordon was in custody, at which point Defendant stated Mrs. Gordon approached him in Mr. Ellis's truck looking to buy drugs. Although he noted Defendant kept adding to his story, Detective Vance stated there were no other serious changes to the story that day. He did, however, note that he allowed Defendant and Mrs. Gordon to see each other in the jail.

Detective Vance acknowledged interviewing Defendant multiple times on October 27, 2016, noting Defendant offered to take a polygraph at one point and was initially pretending to fall asleep during interviews. Detective Vance testified Defendant told them he was in the truck with Mrs. Gordon, whom he claimed threw Mr. Ellis's wallet out of the truck while driving on Nona Street. Detective Vance notes Defendant eventually stated Mrs. Gordon killed Mr. Ellis in an area off Industrial Road. Defendant told Detective Vance the same story described by Special Agent Thomas, wherein Mrs. Gordon and Mr. Ellis got out of the car, Defendant heard three or four gunshots, then Mrs. Gordon returned to the truck and they left. As previously described by Special Agent Thomas, Detective Vance indicated Defendant's story continued to change after law enforcement searched the Industrial Road area and found no body.

A few weeks later, Defendant told Detective Vance that he helped Mrs. Gordon move Mr. Ellis's body, claiming they loaded the body into Mr. Ellis's truck, visited Mr. Cassetti Brown, picked up a woman named Amy, then met a man named Dave at a trailer park. Detective Vance noted Mr. Ellis's truck was ultimately

located at said trailer park. After Dave threatened Defendant, Defendant and Mrs. Gordon took Mr. Ellis's body to a burn pile off Pine Road with Dave and Amy following in another vehicle. According to Detective Vance, they spent hours looking for the burn pile off Pine Road, but Defendant was unable to lead them to it. Detective Vance testified Defendant led them to an address on Gunn Drive, directly off Pine Road. Detective Vance testified there was a burn pile at the location, but a search turned up no human remains. At that point, Defendant admitted to Detective Vance that Mr. Ellis's body had been brought to Defendant's home.

Defendant told Detective Vance they wrapped Mr. Ellis's body in a tarp and placed it back into Mr. Ellis's truck in order to move it to Defendant's home. Detective Vance testified Defendant stated he and Dave brought the body back to Defendant's home, Dave left, and Defendant continued burning the body. At that point, Detective Vance, Special Agent Thomas, and Defendant headed to Defendant's residence at 376 Dean Conerly. Initially finding no human remains, Detective Vance testified he confronted Defendant, who insisted the body was burned on his property, identified a maul that he had used to break up some of the bones, and stated he and Mrs. Gordon had thrown some of the remains near the wood line. Defendant subsequently told Detective Vance he had swept up chunks of bone and thrown them into two ponds on neighboring land. Detective Vance testified he found what he believed were pieces of a skull plate in the small pond and notified his superiors. The coroner was contacted, and he eventually contacted the LSU FACES lab. Defendant's final interview, given on November 17, 2016, was then played for the jury.

Noting Defendant had claimed the body was transported in the back of Mr. Ellis's truck multiple times, Detective Vance testified the bed of the truck was

20

undisturbed and did not support Defendant's story that Mr. Ellis was dead when his body was brought to Defendant's home. Detective Vance testified that after Ms. Smith broke down and told them Mrs. Gordon and Defendant planned to rob Mr. Ellis prior to his death, Detective informed Defendant he was under arrest for first degree murder. According to Detective Vance, Defendant insisted there was another person involved in the whole thing but would not discuss it then, asking Detective Vance to come back and talk with him after a couple days.

The State then played a short audio recording of a phone conversation between Defendant and Ms. Smith wherein she told Defendant law enforcement already knew Mrs. Gordon killed Mr. Ellis, that Defendant helped, and that Defendant was not forced to help. Detective Vance testified that after this phone call, Ms. Smith started changing her story so that it was not so damning to Defendant. Following Detective Vance's testimony, the State rested its case.

Defendant took the stand on his own behalf. He acknowledged having multiple felony convictions, including illegal use of a moveable in 2009, attempted possession of Alprazolam in 2009, unauthorized use of a moveable in 2012, simple burglary in 2012, and simple escape in either 2013 or 2014. Defendant testified that prior to September 19, 2016, he did not know Wanda Gordon and had never spoken to her. Defendant testifies that Ms. Smith was using the website Plenty of Fish as a source of income, claiming Mr. Ellis came to Defendant's home on September 19, 2016, to meet Ms. Smith. Defendant stated Ms. Smith met Mr. Ellis outside, they came into the house, and the two of them were sitting on a bed in the living room talking while he was in another room with the kids. After about fifteen or thirty minutes, Defendant heard another voice in the living room.

21

Defendant testified he looked into the living room and saw Mr. Ellis arguing with Mrs. Gordon, who he repeatedly stated he did not know at the time. Defendant stated he spoke to Mr. Ellis, who he believed was drunk and who kept apologizing. According to Defendant, Mr. Ellis went outside, where Mrs. Gordon was waiting; the two began to argue, and in less than thirty seconds there was a gunshot and Mrs. Gordon was standing over Mr. Ellis's body. He testified that when he tried to walk away from Mrs. Gordon, she hit him in the back of the head with the gun. Defendant testified that in order to avoid Mrs. Gordon from shooting him, he would help her cover up the murder. Defendant did not hear Mrs. Gordon threaten Ms. Smith or Defendant's children.

Defendant stated Mrs. Gordon took Mr. Ellis's wallet out of his pocket before the two of them moved the body to Defendant's burn pile. Defendant then stated the rest of his recorded statement was true, that he participated in burning and breaking up Mr. Ellis's body. Defendant claimed he helped Mrs. Gordon dispose of the body out of fear. Defendant stated they gathered wood to start a fire as well as some tires and other items to keep the fire going. During this process, Defendant testified Mrs. Gordon asked if he could get her crack cocaine and Defendant called someone who told him they were waiting on more supply. Defendant testified Mrs. Gordon obtained gasoline from Defendant's property and doused the body to accelerate the fire before demanding he go to the store with her to ensure she got some crack.

After deciding she was not going to keep Mr. Ellis's phone, Defendant testified Mrs. Gordon asked him if he knew anyone who would want to buy it. He stated they then went to Cassetti Brown's house. Defendant testified Mrs. Gordon was inside for "quite a while" before coming back aggravated that she could not sell

the phone. Defendant stated that he was speaking to Brian Cheley at Shop Rite while Mrs. Gordon purchased a beer, cigarettes, and gas. They then proceeded to the slab, where they met Denny Peters, who told Mrs. Gordon he could get her some crack. According to Defendant, they then proceeded to what he believes was Clarence Justice's house, where an Asian guy sold Mrs. Gordon a crack rock. Defendant testified a woman came out and told Clarence to get rid of everyone. At that point, Defendant and Mrs. Gordon left and headed to Eddie Shaw's house. Despite not knowing how to drive a vehicle with a standard transmission, such as Mr. Ellis's truck, Defendant stated he drove the truck to Walmart. Defendant then drove home.

Once home, Defendant wiped down the inside of the truck to try and remove his fingerprints. According to Defendant, Ms. Smith tried to convince him to call law enforcement, but he convinced her that she might get in trouble and refused. Defendant acknowledged pouring the gasoline Mrs. Gordon bought onto Mr. Ellis's body. Defendant then drove Mr. Ellis's truck to the trailer park where it was found, which was near Defendant's grandparents' home before getting a friend to drive him to DeRidder. He testified he spent a few hours in DeRidder before getting a ride back to his grandparents' home, where his grandfather ultimately brought him home. After re-lighting the fire, Defendant testified he called his grandfather to bring him to the library so he could work on online classes. Over the course of the next month or so, Defendant continued disposing of unburnt pieces of Mr. Ellis's body in multiple locations, as described by Dr. Listi.

Defendant acknowledged continuously lying to law enforcement throughout the months of October and November. He stated he was testifying to try and give Mr. Ellis's family closure. He repeatedly denied having any knowledge of who Mrs.

23

Gordon was prior to her killing Mr. Ellis and denied having ever agreed with her to rob Mr. Ellis.

On cross-examination, Defendant acknowledged his conviction was for attempted possession with the intent to distribute Alprazolam, not simply attempted possession, but contended he had no intent to distribute the pills. He also argued that although he was convicted of simple burglary, he never actually entered anyone's home. He then argued with the State regarding his knowledge of the Plenty of Fish website after acknowledging he was having a sexual relationship with a woman in DeRidder he met on the website. Defendant and the State then heatedly discussed Defendant telling Ms. Smith to lie on the jail call and how much of her testimony was false, with Defendant claiming multiple times Ms. Smith was forced to lie by law enforcement.

Defendant acknowledged that all his stories about Amy and Dave and being compelled by them to help Mrs. Gordon were complete fabrications and that they had nothing to do with Mr. Ellis's death. Defendant, having previously admitted to drinking alcohol that had been purchased by Mr. Ellis, claimed the alcohol was part of Mr. Ellis's payment to Ms. Smith for their time together. The State questioned Defendant about Percocet pills that may have been in Mr. Ellis's possession, and Defendant again claimed Mr. Ellis had brought the pills for Ms. Smith and that Defendant had simply forgot to mention them during his direct testimony. Following Defendant's testimony, the defense rested, and the State offered no rebuttal. A unanimous jury found Defendant guilty as charged on both counts after sixteen minutes of deliberation.

24

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.

Defendant was advised at sentencing that he has "two years to file any claim for post-conviction relief." We find the trial court failed to properly advise the Defendant of the time limitation for filing an application for post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 provides the defendant has two years *after the conviction and sentence become final* to seek post-conviction relief. We find the advisement was insufficient and direct the trial court to inform the Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to the Defendant within ten days of the rendition of this opinion and to file written proof in the record that the Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**ASSIGNMENT OF ERROR**

In his sole assignment of error, Defendant contends there was insufficient evidence to convict him of being a principal to second degree murder. Specifically, Defendant contends the State failed to prove he was involved in a robbery of Mr. Ellis because the only evidence that he was involved comes from Ms. Smith and Mrs. Gordon, whose testimony Defendant contends "is so incoherent and internally inconsistent that it could not be believed by a rational finder of fact." The State, on the other hand accurately points out that "[t]his case is a matter revolving almost exclusively around the jury's determination regarding witness credibility." Additionally, the State contends Defendant need not have been involved in a robbery

25

in order to prove second degree murder, noting Defendant was charged under the general second degree murder statute, La.R.S. 14:30.1, and not the specific subsection regarding murder during certain enumerated crimes.

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138 (alteration in original):

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

Defendant explicitly asks this court to reject the jury's credibility determinations and acquit him of being a principal to second degree murder. The law of principals, defined in La.R.S. 14:24, states: "All persons concerned in the

commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Additionally, second degree murder is relevantly defined in La.R.S. 14:30.1(A), in pertinent part, as the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

There is no question in this case that Mrs. Gordon was attempting to rob Mr. Ellis when she shot him in the back of the head after he refused to hand over his money. By definition, her actions qualify as second degree murder, despite her plea to manslaughter. The question before the jury was whether Defendant was a principal to said crime. According to Mrs. Gordon's testimony, Defendant provided her with the murder weapon and told her to kill Mr. Ellis when Mr. Ellis would not hand over his money. Considering the previous quote from *F.B.A.*, 983 So.2d 1006, we find Mrs. Gordon's testimony alone was sufficient to prove Defendant aided and abetted in the murder of Mr. Ellis.

Defendant contends that Mrs. Gordon's testimony is internally inconsistent and thus "is insufficient to establish that Mr. Williams was part of a robbery." We suggest this argument lacks merit. The story Mrs. Gordon testified to at trial was not internally inconsistent and lacked any serious internal contradictions. Instead, as evidenced by Defendant's summary of Mrs. Gordon's story, the only

27

contradictions within Mrs. Gordon's testimony was the fact that her trial testimony was different from her prior statements:

> This testimony was given under circumstances where she—who killed Mr. Ellis in cold blood—had been given a 40-year plea to manslaughter. She in fact failed to identify Mr. Williams in a lineup, and claimed she only knew him as "Leggs"—a nickname that authorities never otherwise linked to Mr. Williams. In addition, she did not mention this level of cooperation between herself and Mr. Williams until the time of trial. She claimed that she did not want to identify him when she was first arrested, and she did not mention Mr. Williams at all when she first admitted to the killing to Ashley Cenate.

There were three living witnesses to the murder of Mr. Ellis: Wanda Gordon, Dominishca Smith, and Defendant. All three of them gave multiple interviews with law enforcement, all with evolving and changing stories each time they were interviewed. At trial, all three of them presented new versions of what happened that night, which included substantial changes to aspects of their prior versions of events. The jury was presented with the testimony of all three individuals, as well as extensive evidence regarding the various alternative versions of events those individuals had previously told law enforcement. Acting as the trier of fact, the jury unanimously convicted Defendant of second degree murder, evidently accepting the version of events presented by Mrs. Gordon.

Given the above, we find the State presented sufficient evidence to prove Defendant was guilty as a principal to the second degree murder of Mr. Ellis. Furthermore, as has been previously stated, all three witnesses to Mr. Ellis's murder lied to law enforcement on multiple occasions during the investigation. Accordingly, we affirm Defendant's convictions and sentences.

**CONCLUSION**

Defendant's convictions and sentences are affirmed. We also direct the trial court to inform the Defendant of the provisions of La.Code Crim.P. art. 930.8 by

28

sending written notice to the Defendant within ten days of the rendition of this opinion and to file written proof in the record that the Defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**